**Slip Op. 14-39**

**UNITED STATES COURT OF INTERNATIONAL TRADE**

| | |
|---|---|
| SAMSUNG ELECTRONICS CO., LTD., | : |
| Plaintiff, | :<br>: |
| v. | : Before: Nicholas Tsoucalas,<br>: Senior Judge |
| UNITED STATES, | :<br>: Court No.: 13-00099 |
| Defendant, | :<br>: Public VERSION |
| and | :<br>: |
| WHIRLPOOL CORPORATION, | :<br>: |
| Defendant-Intervenor. | : |

<u>**OPINION and ORDER**</u>

[Plaintiff's motion for judgment on the agency record is granted in part and denied in part.]

Dated: April 11, 2014

<u>Warren E. Connelly</u>, Akin Gump Strauss Hauer & Feld LLP, of Washington, DC, for plaintiff. With him on the brief were <u>J. David Park</u>, <u>Jarrod M. Goldfeder</u>, <u>Nazakhtar Nikakhtar</u>, and <u>Phyllis L. Derrick</u>.

<u>Douglas G. Edelschick</u>, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, for defendant. With him on the brief were <u>Stuart F. Delery</u>, Assistant Attorney General, <u>Jeanne E. Davidson</u>, Director, and <u>Franklin E. White, Jr.</u>, Assistant Director. Of counsel on the brief was <u>Whitney Rolig</u>, Attorney, Office of the Chief Counsel for Trade Enforcement & Compliance, U.S. Department of Commerce, of Washington, DC.

<u>Jack A. Levy</u>, Cassidy Levy Kent USA LLP, of Washington, DC, for defendant-intervenor. With him of the brief were <u>John D. Greenwald</u>, <u>Myles S. Getlan</u>, <u>Matthew Frumin</u>, <u>Thomas M. Beline</u>, and <u>Jonathan M. Zielinski</u>.

**Tsoucalas, Senior Judge:** Plaintiff Samsung Electronics

Co., Ltd. ("Samsung"), moves for judgment on the agency record

contesting defendant United States Department of Commerce's ("Commerce") determination in Large Residential Washers From the Republic of Korea: Final Affirmative Countervailing Duty Determination, 77 Fed. Reg. 75,975 (Dec. 26, 2012) ("Final Determination"). Commerce and defendant-intervenor Whirlpool Corporation, oppose Samsung's motion. For the following reasons, Samsung's motion is granted in part and denied in part.

## BACKGROUND

In January 2012, Commerce initiated a countervailing duty ("CVD") investigation of large residential washers ("LRWs") from Korea. See LRWs From the Republic of Korea: Initiation of CVD Investigation, 77 Fed. Reg. 4279 (Jan. 27, 2012). The period of investigation ("POI") covered the 2011 calendar year. Id. Samsung was one of three companies Commerce investigated. Id. at 4281.

In the Final Determination, Commerce found that the Government of Korea ("GOK") provided countervailable subsidies to Samsung, warranting the application of a 1.85% ad valorem CVD rate. See Final Determination, 77 Fed. Reg. at 75,977. Of particular relevance to the instant action, Commerce found that Samsung received countervailable benefits through its receipt of tax credits under the Restriction of Special Taxation Act ("RSTA") Articles 10(1)(3) and 26. Also at issue is Commerce's calculation of the sales value it used to determine Samsung's ad valorem rate.

Under RSTA Art. 10(1)(3), the GOK provides a tax credit

to companies making eligible investments in research and human resources development ("R&D"). See LRWs From the Republic of Korea: Preliminary Affirmative CVD Determination and Alignment of Final Determination With Final Antidumping Determination, 77 Fed. Reg. 33,181, 33,187 (Jun. 5, 2012) ("Preliminary Determination"). The GOK introduced Art. 10(1)(3) in 1982 and during the POI approximately 11,000 companies received tax credits under the program. Id. The GOK calculates a company's Art. 10(1)(3) tax credit in one of two ways, either 40% of the difference between eligible expenditures in the tax year and the average of eligible expenditures in the prior four years, or a maximum of 6% of eligible expenditures in the current tax year. Id. Commerce found that Samsung's Art. 10(1)(3) tax credits were de facto specific because Samsung received a disproportionately large share of the total benefit the GOK conferred under this program. See Issues and Decision Memorandum for the Final Determination in the CVD Investigation of LRWs from the Republic of Korea at 11–13 (Dec. 18, 2012) ("IDM"). Specifically, Commerce determined that Samsung received [[  ]]% of the total benefit the GOK conferred under RSTA Art. 10(1)(3), while the average beneficiary received [[     ]]%. See Calculations for Samsung (Dec. 18, 2012), Confidential Rec. 196,[1] Att. 7 at 1.

---

    [1] Hereinafter, documents in the public record will be designated "PR" and documents in the confidential record designated

Under RSTA Art. 26, the GOK provides a tax credit for eligible investments in "business assets out of overcrowding control region of the Seoul Metropolitan Area." Preliminary Determination, 77 Fed. Reg. at 33,188. Companies can receive a tax credit of 7% of their eligible investments. Id. Commerce found that Samsung's Art. 26 tax credits were "regionally specific" because the GOK "established a designated geographical region to which th[e] program is available." Id.

Finally, the ad valorem rate of 1.85% for the Final Determination was greater than the 1.20% rate Commerce calculated for the Preliminary Determination. See Final Determination, 77 Fed. Reg. at 75,977; Preliminary Determination, 77 Fed. Reg. at 33,193. For the Preliminary Determination, Commerce calculated the ad valorem rate using Samsung's total worldwide sales value.[2] See Calculations for Samsung for the Preliminary Determination Memorandum (May 29, 2012), CR 114 at 2. However, Commerce adjusted the sales value in the Final Determination, excluding revenue from the sale of merchandise produced by Samsung's foreign subsidiaries and from non-production related activities. Id. These adjustments

---

"CR" without further specification except where relevant.

[2] Commerce calculates the ad valorem CVD rate by dividing the "amount of the benefit" the respondent received by the sales value of the product or products to which Commerce attributes the subsidy. 19 C.F.R. § 351.525(a). Accordingly, in the ad valorem rate calculation, the benefit the respondent received is the numerator and the sales value is the denominator.

reduced the sales value from approximately [[          ]] Korean Won to approximately [[          ]] Korean Won and, as a result, increased Samsung's ad valorem CVD rate.  See Calculations for Samsung (Dec. 18, 2012), CR 196 at 2.

Samsung now moves for judgment on the agency record contesting several aspects of the Final Determination.  See Pl.'s Mem. Supp. R. 56.2 Mot. J. Agency. R. at 1–2.  Oral Argument was held on January 30, 2014.  Oral Argument, Samsung Electronics Co. v. United States, Ct. No. 13-00099 (Ct. Int'l Trade Jan. 30, 2014).

### JURISDICTION and STANDARD OF REVIEW

The Court has jurisdiction pursuant to 28 U.S.C. § 1581(c) (2006) and section 516A(a)(2)(B)(I) of the Tariff Act of 1930 (the "Act"),[3] as amended, 19 U.S.C. § 1516a(a)(2)(B)(I) (2006).  The court will uphold Commerce's final determination in a CVD investigation unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law."  19 U.S.C. § 1516a(b)(1)(B)(I).

Additionally, "an agency's interpretation of its own regulations is entitled to broad deference from the courts." Cathedral Candle Co. v. U.S. Int'l Trade Comm'n, 400 F.3d 1352, 1363 (Fed. Cir. 2005).

---

[3] Further citations to the Tariff Act of 1930 are to the relevant portions of Title 19 of the U.S. Code, 2006 edition, and all applicable amendments thereto.

## DISCUSSION

The following issues are before the court: (1) Whether Commerce properly determined that Samsung received specific benefits under RSTA Arts. 10(1)(3) and 26; (2) Whether Commerce properly determined that Samsung failed to demonstrate that the benefits it received were tied to products other than LRWs; and (3) Whether Commerce properly excluded certain sources of revenue from Samsung's sales value when calculating the ad valorem CVD rate.

## I. Specificity

Under the Act, "a countervailable subsidy is a subsidy . . . which is specific as described in [19 U.S.C. § 1677(5A)]." 19 U.S.C. § 1677(5)(A). Where the subsidy in question is a domestic subsidy, as is the case here, Commerce may find that the subsidy is specific as a matter of law or as a matter of fact. 19 U.S.C. § 1677(5A)(D).

Here, as noted above, Commerce found that Samsung's Art. 10(1)(3) tax credits were specific as a matter of fact because Samsung received a "disproportionately large amount" of the total benefit the GOK conferred under that program. See IDM at 34. Additionally, Commerce found that Samsung's Art. 26 tax credits were regionally specific because the GOK limited benefits to companies that made investments within a "designated geographical area." Id. at 46. Samsung contests both of these findings.

## A. RSTA Article 10(1)(3)

A domestic subsidy is specific in fact if "[a]n enterprise or industry receives a disproportionately large amount of the subsidy." 19 U.S.C. § 1677(5A)(D)(iii)(III). The Court of Appeals for the Federal Circuit ("Federal Circuit") held that "determinations of disproportionality . . . are not subject to rigid rules, but rather must be determined on a case-by-case basis taking into account all the facts and circumstances of a particular case." AK Steel Corp. v. United States, 192 F.3d 1367, 1385 (Fed. Cir. 1999). Accordingly, the court seeks to determine whether Commerce's disproportionality finding was reasonable given the facts of the instant case. Id.

Here, Commerce determined disproportionality by comparing "the average amount of the tax credits provided to companies in Korea that used [the Art. 10(1)(3)] program during 2010, to the actual amount of the tax credits received by Samsung . . . in that same year." IDM at 35. Commerce found that Samsung received a disproportionate benefit because it received [[  ]]% of the total benefit the GOK conferred under Art. 10(1)(3), while the average recipient received [[    ]]%. See CR 196, Att. 7 at 1.

Samsung argues that its Art. 10(1)(3) tax credits were large but proportionate to its eligible R&D expenditures.[4] See

---

[4] Alternatively, Samsung argues that Commerce should have measured disproportionality by comparing the use of Art. 10(1)(3)

Pl.'s Br. at 9. Samsung argues that Commerce simply equated the larger benefit with disproportionality, but failed to provide any additional evidence indicating that the benefit was disproportionate. Id. According to Samsung, the Art. 10(1)(3) tax credits were based on a standard mechanism as each participant received the same benefit relative to its eligible investments. Id. Samsung contends that both case precedent and prior administrative determinations indicate that a large benefit is proportionate where the respondent receives the same benefit as all other beneficiaries relative to its expenditures. Id. at 10–13.

There is no dispute that Samsung's share of the Art. 10(1)(3) tax credits was larger than that of the average beneficiary. See CR 196, Att. 7 at 1. The issue is whether this comparison was sufficient to support a finding of disproportionality given the facts of the instant case. See AK Steel, 192 F.3d at 1385. The court finds that it was not.

In focusing solely on Samsung's relative share of the total benefit, Commerce failed to consider aspects of the Art. 10(1)(3) program relevant to disproportionality. Specifically, the

---

tax credits by other Korean companies with the use of Art. 10(1)(3) credits by its Home Appliance Unit alone. Pl.'s Br. at 10 n.9. Samsung raises this argument in a footnote and does not identify any authority supporting its position. See id. Accordingly, this argument is waived. See SmithKline Beecham Corp. v. Apotex Corp., 439 F.3d 1312, 1320 (Fed. Cir. 2006) ("[A]rguments raised in footnotes are not preserved").

record indicated that the GOK confers Art. 10(1)(3) tax credits based on usage and pursuant to a standard pricing mechanism. See CR 40 at 108. Accordingly, the GOK did not exercise discretion in awarding Samsung's tax credit, but simply conferred the benefit relative to the eligible expenditures. Id.

This Court previously found that it was reasonable for Commerce to consider an enterprise or industry's use of a subsidy program in determining whether the benefit was proportionate. In Bethlehem Steel v. United States, the Korean steel industry received 51% of the total benefit the GOK awarded under an electricity rate reduction subsidy. See 25 CIT 307, 322, 140 F. Supp. 2d 1354, 1369 (2001). Nevertheless, Commerce found that the benefit was proportionate because high electricity usage was an inherent characteristic of the steel industry, all recipients received an identical rate reduction based on a standard mechanism, and the subsidy was not designed to benefit any one industry over another. See id. at 321–23, 140 F. Supp. 2d at 1368–70. Commerce insists that Bethlehem Steel is distinguishable from the instant case given the Korean steel industry's electricity use. See IDM at 37. The Court recognized, however, that "[i]n virtually every program that confers benefits based on usage levels one or more groups will receive a greater share of the benefits[,]" and therefore concluded that the fact that one group received more benefits is not, on its own, indicative of disproportionality.

<u>Bethlehem Steel</u>, 25 CIT at 322, 140 F. Supp. 2d at 1369.

Similarly, in <u>AK Steel</u>, the respondent received 75% of the total benefit the GOK provided under an asset revaluation program, but Commerce found that this large benefit was proportionate because the respondent revalued its assets 0.2% lower than the average participant. See <u>AK Steel</u>, 192 F.3d at 1385. The Federal Circuit recognized that Commerce need not always consider the relative share of the total benefit to determine disproportionality because that method "could produce an untenable result, i.e., that a benefit conferred on a large company might be disproportionate merely because of the size of the company." <u>Id.</u>

Neither the Federal Circuit in <u>AK Steel</u> nor this Court in <u>Bethlehem Steel</u> required Commerce to consider whether the benefit awarded was proportionate relative to a beneficiary's use of the program. See <u>AK Steel</u>, 192 F.3d at 1384–85; <u>Bethlehem Steel</u>, 25 CIT at 322–23, 140 F. Supp. 2d at 1369–70. However, both courts found that Commerce's method must account for the facts of the case, including aspects of the subsidy program itself. Commerce's explanation fails to meet this standard.

Commerce claimed that its method was reasonable in light of the evidence on the record. <u>IDM</u> at 36. Specifically, Commerce insists that it compared Samsung's share of the total benefit with the share an average beneficiary received because the GOK did not provide data on individual beneficiaries. <u>Id.</u> at 36–37. However,

Commerce's questionnaire did not request information on individual beneficiaries other than the mandatory respondents. See CR 40 at 114. Furthermore, as noted above, the GOK provided information detailing the Art. 10(1)(3) tax credit program and Samsung provided its tax return detailing its expenditures. Id.; Resp. of Samsung to Commerce's Sept. 10, 2012 Supplemental Questionnaire (Sep. 17, 2012), CR 156 at 1–3.

Commerce also noted that it previously found that a benefit was disproportionate where the respondent's share of the total benefit was greater than the share an average beneficiary received. See IDM at 36 n.139 (citing Final Affirmative CVD Determinations: Pure Magnesium and Alloy Magnesium From Canada, 57 Fed. Reg. 30,946 (Jul. 13, 1992) ("Magnesium From Canada"); Corrosion-Resistant Carbon Steel Flat Products From the Republic of Korea: Preliminary Results and Partial Rescission of CVD Administrative Review, 75 Fed. Reg. 55,745 (Sep. 14, 2010) ("CSFP From Korea - Preliminary"); and Final Affirmative CVD Determination: Certain Stainless Steel Wire Rod From Italy, 63 Fed. Reg. 40,474 (Jul. 29, 1998) ("Wire Rod from Italy")). However, these determinations are not analogous to the instant case. Neither Magnesium from Canada nor Wire Rod From Italy concerned a subsidy based on a standard pricing mechanism, but rather involved grants and interest-savings programs awarded at the discretion of the administering authority. See Magnesium from Canada, 57 Fed.

Reg. at 30,949–50; Wire Rod From Italy, 63 Fed. Reg. at 40,485–86. Furthermore, Commerce's reliance on CSFP From Korea - Preliminary is misplaced because Commerce found that the subsidy in question was specific as a matter of law in the final results of that review.[5] See Corrosion-Resistant Carbon Steel Flat Products From the Republic of Korea: Decision Memorandum: Final Results of CVD Administrative Review at 2–3 (Jan. 12, 2011).

Finally, Commerce insists that its method was consistent with the purpose of CVD law. IDM at 37. According to Commerce, "[t]he very purpose for the analysis of de facto specificity . . . is to ensure that companies that qualify and receive more benefits under a government subsidy program do not escape redress of the [CVD] law simply because the law implementing the subsidy program does not explicitly limit the benefits to a group of enterprises or industries." Id. (underscoring in original). To that end, Commerce rejected Samsung's assertion that it should measure the benefit relative to the size of the beneficiary or to the amount of qualifying investments. Id.

The court acknowledges Commerce's concern and the purpose of de facto specificity within the Act. However, this concern does not obviate Commerce's responsibility to determine whether a large

---

[5] Commerce did not review specificity as a matter of law during the preliminary results because it did not have a full translation of the law in question. CSFP From Korea - Preliminary, 75 Fed. Reg. at 55,745.

benefit is disproportionate based on the facts of the case. See AK Steel, 192 F.3d at 1385. Although Commerce's method indicated that Samsung received a large benefit, more was required to determine whether the benefit was disproportionate. See 19 U.S.C. § 1677(5A)(D)(iii)(III). Simply reciting a concern that applies equally to all broadly-worded subsidy provisions is insufficient to show that, on the facts of this case, the subsidy was disproportionate. See AK Steel, 192 F.3d at 1384–85.

Commerce's determination was unreasonable because it did not adequately address how Samsung's Art. 10(1)(3) tax credit was disproportionately large based on the facts in the case. Accordingly, the court must remand this case to Commerce with directions to reconsider its determination. On remand, Commerce is not barred from comparing Samsung's share of the total benefit to the share an average beneficiary received, but it must explain, with specific reference to the facts of this case, why such a comparison is indicative of disproportionality.

### B. RSTA Article 26

"Where a subsidy is limited to an enterprise or industry located within a designated geographical region within the jurisdiction of the authority providing the subsidy, the subsidy is specific." 19 U.S.C. § 1677(5A)(D)(iv). As noted above, under Art. 26, the GOK provided tax credits for eligible investments in "business assets" outside the "overcrowding control region of the

Seoul Metropolitan Area." Preliminary Determination, 77 Fed. Reg. at 33,188. Commerce found that Samsung's Art. 26 tax credits were regionally specific because they were limited to a "designated geographical region." See IDM at 46.

Samsung's primary argument is that Commerce's determination was erroneous because the area "outside the Seoul Metropolitan Area" was too broad to constitute a designated geographical region. Pl.'s Br. at 24–27. According to Samsung, "[t]he tax credit benefits available under Article 26 encompassed the entire country minus just [2%] of its land mass." Id. at 24. Therefore, Samsung insists that Art. 26 tax credits were "generally available" and not of a type contemplated by the regional specificity standard. Id. at 25–26. Instead, Samsung suggests that regional specificity should be limited to "administrative jurisdictions such as provinces or states." Id. at 26.

This argument is unpersuasive. The Act requires that the authority providing the subsidy limit the subsidy's availability to a "designated geographical area." 19 U.S.C. § 1677(5A)(D)(iv). Contrary to Samsung's insistence, there are no limitations on the size or administration of the designated area. Id. This Court previously upheld Commerce's finding that a subsidy providing cheaper electricity rates to all areas in Thailand outside the Bangkok metropolitan area was regionally specific. See Royal Thai Government v. United States, 30 CIT 1072, 1079, 441 F. Supp. 2d

1350, 1358 (2006). The Court held that Commerce's finding was reasonable because "[a]ccess to this relatively cheaper electricity was expressly contingent upon only one factor: a company's regional location within Thailand." Id., 441 F. Supp. 2d at 1358. Similarly, the GOK limited the availability of Art. 26 tax credits to companies making investments in a designated region: the area outside the Seoul Metropolitan Area. See IDM at 46. Because access to Art. 26 tax credits was conditioned upon investment in a "designated geographical region," Commerce's regional specificity determination was reasonable. See 19 U.S.C. § 1677(5A)(D)(iv); Royal Thai, 30 CIT at 1079, 441 F. Supp. 2d at 1358.

Samsung also argues that Commerce's determination contradicts its prior finding in Initiation of CVD Investigation of Live Cattle From Canada, 63 Fed. Reg. 71,889 (Dec. 30, 1998) ("LCC Initiation"). Pl.'s Br. at 25–26. There, Commerce declined to investigate the British Columbia Farm Product Industry Act because, although the subsidy was available only in British Columbia, it was not limited to an industry or entity within the province. See LCC Initiation, 63 Fed. Reg. at 71,892. Samsung insists that the case is instructive because the designation of British Columbia was not sufficient to establish regional specificity. See Pl.'s Br. at 26.

Samsung's reliance on this determination is misplaced. There is no indication that the British Columbia Farm Product Industry Act designated a geographical region. Although British

Columbia is a region, all indications are that the authority providing the subsidy in question was a provincial authority of British Columbia, as was the case with the other Canadian subsidy programs Commerce investigated. See Final Negative CVD Determination; Live Cattle From Canada, 64 Fed. Reg. 57,040, 57,040-55 (Oct. 22, 1999) (recognizing that each of the subsidy programs under review was administered by a provincial authority). It is consistent with both the Act and the instant case that Commerce found that a subsidy available throughout British Columbia and administered by the province itself was not regionally specific. See 19 U.S.C. § 1677(5A)(D)(iv). Accordingly, Samsung fails to show that Commerce's determination was unreasonable. Id.

## II. Tying to Non-Subject Merchandise

The next issue is whether Commerce properly disregarded evidence indicating that Samsung used the tax credits in question towards the production of merchandise other than LRWs. During the review Samsung placed a document onto the record which detailed its actual use of the tax credits under review. See Response of Samsung to the Department's Feb. 15, 2012 Questionnaire (Apr. 9, 2012), CR 85, Exh. 25 at 1 ("Exhibit 25"). Exhibit 25 indicated that [[ ]]% of Samsung's eligible investments under Art. 10(1)(3) and [[ ]]% of its eligible investments under Art. 26 were tied to products other than LRWs. Id. Commerce disregarded this evidence because it did not demonstrate that the GOK was aware of or

acknowledged Samsung's intended use of the tax credits at the time it provided them to Samsung.  See IDM at 41–42.

Commerce "will attribute a domestic subsidy to all products sold by a firm, including products that are exported." 19 C.F.R. § 351.525(b)(3) (2014).  However, "[i]f a subsidy is tied to the production or sale of a particular product, [Commerce] will attribute the subsidy only to that product."  19 C.F.R. § 351.525(b)(5).  Commerce explained that it will find that a subsidy is tied to a certain product "when the intended use is known to the subsidy giver and so acknowledged prior to or concurrent with the bestowal of the subsidy."  See Countervailing Duties: Final Rule, 63 Fed. Reg. 65,348, 65,402 (Nov. 25, 1998) ("CVD Preamble").  Commerce will not "trace the use of subsidies through a firm's books and records," but rather will analyze whether a subsidy is tied "based on information available at the time of bestowal." Id. at 65,403.

Samsung argues that Commerce's decision to disregard Exhibit 25 was unreasonable because its analysis was inapplicable to tax credits.  Pl.'s Br. at 19–23, 27.  According to Samsung, its tax credits operate retroactively — Samsung makes its eligible investments during the tax year, claims a tax credit on its tax return, and then the GOK awards the tax credit if it is properly claimed.  See id. at 19–20.  Because Samsung made the eligible investments well before the GOK awarded the tax credits, the GOK

does not require a declaration of intended use.  Id. at 20. In fact, Samsung contends that Commerce's insistence that Samsung declare its intended use in its tax return contradicts Commerce's statement that it will not trace how a respondent uses a subsidy. Id. at 21.  Despite Commerce's policy, Samsung insists that the Federal Circuit upheld Commerce's use of post-bestowal evidence in Kajaria Iron Castings Pvt. Ltd. v. United States, 156 F.3d 1163, 1176 (Fed. Cir. 1998).  See Pl.'s Br. at 22.  Accordingly, Samsung insists that Commerce should have considered its documentation of actual use as evidence of tying.  Id.

Samsung's argument is unpersuasive.  First, Samsung failed to identify any authority compelling Commerce to adjust its tying methodology based on the nature of the subsidy in question. Kajaria predated the CVD Preamble and therefore did not analyze Commerce's interpretation of 19 C.F.R. § 351.525(b).  See Kajaria, 156 F.3d at 1176 (Fed. Cir. Sep. 8, 1998); CVD Preamble, 63 Fed. Reg. 65,348 (Nov. 25, 1998).  Moreover, Kajaria did not mandate that Commerce rely on post-bestowal evidence, it merely upheld Commerce's decision to do so.  Id.  Furthermore, insofar as Samsung contests Commerce's interpretation of the regulation, this argument is unavailing.  As noted above, the Court grants broad deference to Commerce's interpretation of its own regulations.  See Cathedral Candle, 400 F.3d at 1363.  Commerce's concern with what the government providing the subsidy knew at the time it provided the

subsidy is entirely consistent with the regulation, regardless of whether a subsidy operates prospectively or retroactively. See CVD Preamble, 63 Fed. Reg. at 65,403; 19 C.F.R. § 351.525(b)(5).

Ultimately, the record indicates that the GOK was not aware of and did not acknowledge Samsung's intended use of the tax credits. Samsung's tax returns did not indicate that its eligible investments benefitted the production of particular merchandise. See CR 85, Exh. 22 at 3-5. And, as Samsung admits, Exhibit 25 did not establish the GOK's awareness of Samsung's intended use of the benefits at the time of bestowal. See CR 85, Exh. 25 at 1. Finally, the GOK indicated that it intended the tax credits in question to "boost the general national economic activities in all sectors." See CR 40 at 108. Because Samsung cannot demonstrate that at the time of bestowal the GOK was aware of its intended use of the tax credits, Commerce reasonably concluded that the tax credit benefitted domestic production generally. See 19 C.F.R. § 351.525(b)(3); CVD Preamble, 63 Fed. Reg. at 65,402.

### III. The Sales Value

The final issue before the court is whether Commerce properly adjusted Samsung's sales value when calculating the ad valorem CVD rate. Commerce calculates an ad valorem CVD rate by "by dividing the amount of the benefit allocated to the period of investigation or review by the sales value during the same period of the product or products to which [Commerce] attributes the

subsidy." 19 C.F.R. § 351.525(a).

Here, Commerce did not include certain sources of revenue in Samsung's sales value because they were not derived from the sale of products to which Samsung's tax credits were attributable. See IDM at 52–53. Of particular relevance in the instant case are revenue generated from the production of merchandise by Samsung's foreign subsidiaries and revenue from royalty payments.[6] See Pl.'s Br. at 29. According to Samsung, these sources of revenue were derived from products that benefitted from the tax credits Samsung received. Id. at 28–42. Samsung continues that Commerce's decision to remove them was wrongful because the benefit and the revenue figures Commerce used to calculate the ad valorem rate did not reflect the same universe of products. Id. at 29–31. Furthermore, Samsung insists that Commerce did not provide Samsung with an opportunity to submit evidence demonstrating this fact.

## A. Foreign Production

Commerce declined to include revenue from sales of merchandise produced by Samsung's foreign subsidiaries because Samsung failed to demonstrate that, at the time of bestowal, the GOK expressly intended the tax credits in question to benefit

---

[6] Samsung also claims that Commerce wrongfully excluded revenue from sales of scrap. See Pl.'s Br. at 35–36 n.26. However, this argument is waived because Samsung raises it in a footnote without citing any legal or record support. See SmithKline Beecham, 439 F.3d at 1320.

foreign production.  See IDM at 52.  Samsung insists that Commerce ignored two prior antidumping duty proceedings involving bottom mount combination refrigerator-freezers ("BMCRFs") in which it found that Samsung's R&D expenditures benefitted foreign production.  See Pl.'s Br. at 31–35 (citing Notice of Final Determination of Sales at Less Than Fair Value and Negative Critical Circumstances Determination: BMCRFs From the Republic of Korea, 77 Fed. Reg. 17,413 (Mar. 26, 2012) ("BMCRFs Korea") and Notice of Final Determination of Sales at Less Than Fair Value and Affirmative Critical Circumstances Determination: BMCRFs From Mexico, 77 Fed. Reg. 17,422 (Mar. 26, 2012) ("BMCRFs Mexico")).  Samsung insists that this evidence demonstrated that its tax credits were tied to foreign production and was consistent with the GOK's intent to benefit foreign production.  Id. at 35–38.  Samsung's argument is unpersuasive.

Where a respondent is a multinational company, Commerce "will attribute the subsidy to products produced by the firm within the country of the government that granted the subsidy."  19 C.F.R. § 351.525(b)(7).  However, Commerce allows a respondent to rebut this presumption and will attribute a subsidy to multinational production "if it is demonstrated that the subsidy was tied to more than domestic production."  Id.

The regulations are silent as to how such a showing can be made, but Commerce has stated that "[r]espondents must show

that, in the authorization and/or approval documents, the government explicitly stated that the subsidy was being provided for more than domestic production." CVD Preamble, 63 Fed. Reg. at 65,404. "The documentation must show that, at the point of bestowal, one of the express purposes of the subsidy was to provide assistance to the firm's foreign subsidiaries." Id. And, "[a]bsent such a demonstration, all subsidies, whether tied or untied, will be attributed to . . . domestically-produced sales." Id. The Federal Circuit has approved this methodology. See Inland Steel Indus., Inc. v. United States, 188 F.3d 1349, 1360 (Fed. Cir. 1999) ("Commerce acted correctly in performing its tying determination by assessing the likely effects of the subsidies at issue at the time of their bestowal.").

Here, Samsung failed to provide evidence demonstrating that its tax credits were tied to foreign production. Samsung itself noted that there were no approval or authorization documents expressing the GOK's intent to benefit foreign production. See Pl.'s Br. at 36. Furthermore, BMCRFs Mexico and BMCRFs Korea do not demonstrate that the GOK intended the subsidies to benefit foreign production at the time of bestowal and, therefore, they are insufficient evidence that the tax credits were tied to foreign production under the regulation. See CVD Preamble, 63 Fed. Reg. at 65,404. Finally, the statements of the GOK did not indicate that the "express purpose" of the subsidy was to benefit foreign

production.  See CR 40 at 108 (stating that the tax credits were intended to "boost the general national economic activities in all sectors").  Because Samsung did not provide evidence indicating that, at the time it bestowed the tax credits, the GOK intended to benefit foreign production, Commerce reasonably concluded that the tax credits were not tied to foreign production. See Inland Steel, 188 F.3d at 1360.

### B. Royalty Payments

Commerce did not include revenue Samsung generated from its receipt of royalty payments from its subsidiaries in the sales value because such revenue is non-production related income.  See IDM at 52–53.  Samsung insists that royalty payments are reimbursements for R&D expenditures that benefitted production of merchandise and therefore constitute an "integral" component of Samsung's sales revenue.  Pl.'s Br. at 37.  According to Samsung, Commerce recognized this fact in BMCRFs Mexico and BMCRFs Korea, and included such payments in Final Affirmative CVD Determination: Dynamic Random Access Memory Semiconductors from the Republic of Korea, 68 Fed. Reg. 37,122 (Jun. 23, 2003) ("DRAMS Korea").  See Pl.'s Br. at 31–35, 40–41.  Samsung analogizes the royalty payments at issue with processing fees, noting that Commerce included such fees in the sales value in previous CVD proceedings involving tax credits.  Id. at 41.

Commerce "will attribute a domestic subsidy to all

products sold by a firm, including products that are exported." 19 C.F.R. § 351.525(b)(3). Accordingly, as noted above, Commerce includes in ad valorem rate calculation the "sales value . . . of the product or products to which [Commerce] attributes the subsidy." 19 C.F.R. § 351.525(a). Royalty payments are not revenue generated by the sale of products. Id. Commerce's inclusion of royalty payments in DRAMS Korea is distinguishable because the subsidy at issue in that case was not tied to the production of merchandise. Issues and Decision Memorandum for the Final Determination in the CVD Investigation of DRAMS from the Republic of Korea at 114 (Jun. 16, 2003). However, as Commerce noted and as Samsung acknowledges in its brief, the tax credits here were tied to the production of merchandise. IDM at 53.

Furthermore, Samsung's attempt to analogize its royalty payments to processing fees is unavailing. In the cases in which Commerce included processing fees in the sales value, those fees generated the tax benefits in question. See, e.g., Final Affirmative CVD Determination: Certain Carbon Steel Butt-Weld Pipe Fittings From India, 60 Fed. Reg. 10,564, 10,568 (Feb. 27, 1995) (finding that the fees for respondent's refurbishing program generated tax credits). There is no evidence that the royalty payments Samsung received generated the tax credits at issue. IDM at 53. Because Samsung's royalty payments were not derived from the sale of products to which the subsidy was attributable, it was

reasonable for Commerce to exclude them from the ad valorem rate calculation. 19 C.F.R. § 351.525(a).

### C. Procedural Claims

Samsung also argues that it was not afforded an adequate opportunity to rebut the presumption that its tax credits benefitted solely domestic production. Pl.'s Br. at 39. According to Samsung, Commerce altered its methodology for calculating the sales value midway through the investigation without notifying Samsung that it intended to do so. Id. Samsung compares the instant case with Usinor Sacilor v. United States, 19 CIT 711, 893 F. Supp. 1112 (1995), in which this Court remanded Commerce's determination where it decided to alter its methodology for calculating the sales value following the preliminary results. Pl.'s Br. at 39–40.

Samsung's argument is unpersuasive. Here, Commerce did indicate to Samsung that it intended to exclude certain sources of revenue. See CR 156 at 1. Samsung recognized that Commerce planned to make these exclusions and protested in its questionnaire response, insisting that Commerce include the sources of revenue at issue in the sales value. Id. at 1–3.

Furthermore, Samsung's reliance on Usinor is misplaced. In Usinor, Commerce applied its newly-developed presumption that domestic subsidies benefit domestic production midway through the proceeding. See Usinor Sacilor, 19 CIT at 741–42, 893 F. Supp. at

1138.  However, section 351.525(b)(7) was long established at the time of the underlying investigation.  Samsung had the opportunity to provide evidence that its tax credits were tied to foreign production, but failed to do so.  See CR 156 at 1-3.

## CONCLUSION

Commerce erroneously determined that Samsung's RSTA Art. 10(1)(3) tax credits constituted a disproportionately large benefit.  Commerce properly determined that Samsung's RSTA Art. 26 tax credits were regionally specific and that Samsung failed to demonstrate that its tax credits were tied to products other than large residential washers.  Additionally, Commerce properly adjusted Samsung's sales value when determining the ad valorem CVD rate.  Accordingly, Samsung's motion for judgment on the agency record is granted with regards to Commerce's disproportionality finding, but denied in all other respects.

**ORDER**

In accordance with the above, it is hereby

**ORDERED** that the <u>Final Determination</u> is to be remanded to the United States Department of Commerce, to reconsider its finding that Samsung Electronics Co., Ltd., received a disproportionately large benefit through its receipt of RSTA Art. 10(1)(3) tax credits; and it is further

**ORDERED** that the <u>Final Determination</u> is sustained in all other respects; and it is further

**ORDERED** that remand results are due within ninety (90) days of the date this opinion is entered.  Any responses or comments are due within thirty (30) days thereafter.  Any rebuttal comments are due within fifteen (15) days after the date responses or comments are due.


                                        <u> /s/ Nicholas Tsoucalas </u>
                                          **Nicholas Tsoucalas**
                                            **Senior Judge**

**Dated:**  April 11, 2014
        **New York, New York**